No. 48,724

THE FOURTH NATIONAL BANK AND TRUST COMPANY, WICHITA, *Appellee,* v. MOBIL OIL CORPORATION, *Appellant.*

(582 P.2d 236)

Opinion filed July 15, 1978.

*Robert J. Roth,* of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause and *Louis Hering,* of Mobil Oil Corporation, of New York, New York, and

*Richard Jones,* of Hershberger, Patterson, Jones & Roth, of Wichita, were with him on the brief for appellant.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause and *James M. Armstrong,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: This was an action by The Fourth National Bank and Trust Company, Wichita (the Fourth), appellee, against Mobil Oil Corporation (Mobil), defendant-appellant, for damages based upon Mobil's refusal to purchase certain shares of stock of Marcor, Inc. (Marcor), pursuant to a written tender offer made by Mobil. The case was submitted on an agreed stipulation of facts and the Fourth was granted judgment for $64,991.43. Mobil appeals.

We will attempt to condense the facts from those submitted by the lengthy stipulation in the trial court.

On or about August 12, 1974, Mobil made a written offer to all of the shareholders of Marcor to purchase shares of preferred and common stock issued by Marcor. Mobil offered to acquire only so much of the outstanding stock as would give it control of Marcor. Paragraph 1(a) of the offer informed the shareholders of Marcor that Mobil would purchase 17,250,000 outstanding shares if that many were tendered by 5:00 p.m., August 23, 1974. Paragraph 1(b) stated that if more than 17,250,000 shares were tendered Mobil would buy at least 17,250,000 shares. It also provided that if more than 17,250,000 shares were tendered and Mobil decided not to buy the excess then Mobil would buy the 17,250,000 shares on a pro rata basis.

The offer prescribed two procedures for tendering shares. Any shareholder could tender his shares directly to the depositary, Continental Illinois National Bank and Trust Company of Chicago (Continental), by executing and transmitting a letter of transmittal, in a form designated by Mobil, together with the stock certificates. The letters and certificates had to be received by Continental by 5:00 p.m., August 23, 1974.

The second procedure for tendering certificates, and the one here involved, allowed the submission of a tender without the concurrent deposit of stock certificates. This method permitted the tender of shares through certain financial institutions, such as brokerage firms, commercial banks and trust companies. As in the

direct tender procedure, a duly executed letter of transmittal had to be received by Continental by 5:00 p.m., August 23, 1974. The only difference was that the certificates were not transmitted or delivered with the letter of transmittal but, instead, the bank or other institution was required to execute the guarantee of delivery contained in the letter of transmittal. The certificates could be subsequently deposited or delivered pursuant to the following provision contained in the offer:

"Payment (by Mobil) for Shares so tendered and purchased will be made only against the deposit with the Depositary of the certificates and any other documents required by the Letter of Transmittal *no later than eight business days after public announcement by Mobil that a specified number of Shares will be purchased under this Offer* if all of the terms and conditions of this Offer are satisfied." (Emphasis added)

The guarantee portion of the letter of transmittal provided:

"We . . . a commercial bank . . . guarantee to deliver to the Depositary certificates for the shares of Common Stock tendered by this Letter of Transmittal in proper form for transfer within *eight business days after public announcement by Mobil that a specified number of shares of common stock will be purchased* by Mobil if all the terms and conditions of the Offer are satisfied." (Emphasis added)

Regardless of which method was used the institution would receive a commission from Mobil of 55¢ per share for all shares purchased.

The Fourth did directly and properly submit certificates representing 1,134 shares of Marcor stock. These shares belonged to five trusts and one estate administered by the Fourth. In those instances the Fourth did not retain custody of the certificates but forwarded them to Continental with the letters of transmittal prior to the expiration date. Mobil did buy a pro rata number of these shares pursuant to the terms of the offer and those purchases are not involved in this appeal.

Two customers of the Fourth delivered stock certificates to it for the purpose of tendering their shares to Continental. 6,062 shares of Marcor common stock were to be tendered. Both shareholders properly executed letters of transmittal. The Fourth then executed the guarantees and forwarded the letters of transmittal without the certificates to Continental prior to the August 23, 1974, expiration date. It is these certificates which the Fourth subsequently failed to deliver to Continental and which form the basis of this action.

Mobil contends the Fourth did not deposit the certificates within time to be accepted by Mobil. By forwarding the letters of transmittal, without also forwarding or depositing the certificates at the same time, the Fourth guaranteed to Mobil that 6,062 shares would be deposited within eight business days after "public announcement by Mobil that a specified number of shares" would be purchased.

Mobil's offer was oversubscribed by Marcor shareholders. On August 26, 1974, Mobil issued the following press release:

"MOBIL TENDER OFFER FOR MARCOR OVERSUBSCRIBED

"Mobil Oil Corporation announced today that its offer to purchase shares of common stock and convertible cumulative preferred stock, Series A, of Marcor, Inc. had been oversubscribed and will not be extended.

"A preliminary count shows that as of 5:00 P.M. E.D.T. on Aug. 23, 1974, approximately 24.6 million shares of common stock and approximately 4.3 million shares of preferred stock had been tendered. The majority of these tenders is still in the process of review to confirm their compliance with technical requirements.

"Subject to the terms and conditions of the offer, Mobil will purchase a total of 17,250,000 shares, counting each share of common stock as one share and each share of preferred stock as two shares. Based on the preliminary count, approximately 52 percent of the tendered shares will be purchased on a pro-rata basis if the terms and conditions of the offer are met.

"Institutions that have guaranteed delivery of certificates for shares must deliver all guaranteed shares to the depositary, Continental Illinois National Bank and Trust Company of Chicago, on or before Sept. 6, 1974. Certificates representing the balance of the tendered shares, including those guaranteed, will be returned as soon as practicable after Sept. 6, 1974."

Mobil contends that this press release, and its subsequent dissemination and publication constituted the "public announcement" contemplated by paragraph 4 of the offer and by the letter of transmittal.

The Mobil announcement of August 26, 1974, was delivered to the news media, including the Dow Jones Wire Service; Reuter's Wire Service; P. R. News Wire; Associated Press; United Press International; The Wall Street Journal; Platt's Oil Gram; The Oil and Gas Journal; Petroleum Intelligence Weekly; and to various special industry publications, such as The American Banker, Standard & Poor's, and Moody's Industrial.

The press release was carried in full on the Dow Jones broad tape, which reaches virtually every brokerage office in the country. Pertinent information from the press release was also carried in The Wall Street Journal on August 27, 1974. The Mobil press release, in one form or another, appeared in at least 50 major

newspapers. No determination was made as to how many other smaller newspapers or how many radio or television stations may have carried the announcement. An article appeared in The Wichita Beacon on August 27, 1974, indicating that the offer to acquire Marcor stock had been oversubscribed. Articles also appeared in Standard & Poor's Corporation Records and in Moody's Industrial Manual Supplement.

The Fourth was a subscriber to and received The Wall Street Journal during the time in question and although the Fourth does not subscribe to the Dow Jones broad tape, most brokerage firms in Wichita have this service available for their customers along with Standard & Poor's Corporation Records and Moody's Industrial Manual.

A trust investment officer of the fiduciary investment division of the Fourth was responsible for the handling of the Marcor stock tenders. He assigned the clerical functions and the monitoring of the transactions to one of his assistants, a bookkeeper and clerk. He also indicated he read The Wall Street Journal on occasion but not on a daily basis.

The trust officer of the Fourth relied in part upon the bookkeeper and clerk to see the "public announcement" of Mobil and she assumed that Mobil or Continental would either send a written notice to the Fourth or would telephone the Fourth when it was time to send in the certificates. She was not a reader of The Wall Street Journal and apparently was not instructed to watch for any announcement.

No officer or employee of the Fourth who had any responsibility with respect to the Marcor matter, saw any of the Mobil press release articles appearing in The Wall Street Journal or in any other newspapers or publications. The trust officer, however, did see a follow-up article indicating that the offer had become effective, which appeared in The Wall Street Journal on September 10, 1974.

It was not until approximately September 20, 1974, that the trust officer suggested to his clerk that perhaps they should contact someone at Continental to check on the status of the tender. However, no action was taken.

On September 23, 1974, the Fourth received a telephone call from Continental. The employee of Continental stated she could not find the stock certificates which should have been received

from the Fourth. The assistant in the trust department replied that the Fourth still held the certificates as no notice had been received to send them to Continental. The clerk was then advised that it was too late as the deadline for depositing the certificates had been September 6, 1974.

The 6,062 shares were then tendered to Continental by the Fourth and Mobil refused to purchase them. In discharge of its obligations to its customers the Fourth purchased the shares, paying the amount that its customers would have received if the tenders had been timely made.

Had the certificates been deposited within time, Mobil would have purchased approximately 3,145 shares of Marcor common stock at $35.00 per share. The market value at the time was $17.125 per share.

The Fourth was one of approximately 963 commercial banks, trust companies or brokerage firms that had sent in letters of transmittal without the concurrent deposit of the Marcor stock certificates. Of this number, approximately 699 deposited their certificates within time after Mobil's press release.

The trial court entered findings of fact and conclusions of law and then entered judgment in favor of the Fourth, based upon the difference between $35.00 per share and the closing price of $17.125 per share as of September 24, 1974, plus commissions and interest for a total amount of $64,991.43.

Several points of error are urged by Mobil but the initial question to be determined by this court is whether the press release issued by Mobil constituted a "public announcement" as contemplated by the offer to purchase. The trial judge in his conclusions of law found:

"1. Use of the words 'public announcement' in a tender offer does not give the defendant herein carte blanche to determine the method of announcement. An announcement must be one that is reasonably calculated to provide actual notice by reaching the party to be notified and accurately apprises the one to be notified of the essential facts. Mobil could not reasonably anticipate their announcement would reach the people they had obligated themselves to notify."

We do not agree.

At the outset it is appropriate to note that the case in the trial court was submitted upon an agreed stipulation of facts and relevant documentary evidence and this court is afforded the same opportunity to consider the evidence as the district court. *Westamerica Securities, Inc. v. Cornelius,* 214 Kan. 301, 520 P.2d

1262 (1974); *Jennings v. Jennings,* 211 Kan. 515, 507 P.2d 241 (1973); *Watson v. Dickey Clay Mfg. Co.,* 202 Kan. 366, 450 P.2d 10 (1969).

". . . Where . . . the controlling facts are based upon written or documentary evidence by way of pleadings, admissions, depositions and stipulations, the trial court has no peculiar opportunity to evaluate the credibility of witnesses. In such situation, this court on appellate review has as good an opportunity to examine and consider the evidence as did the court below, and to determine de novo what the facts establish." *American States Ins. Co. v. Hartford Accident & Indemnity Co.,* 218 Kan. 563, 572, 545 P.2d 399 (1976).

This case involves the enforcement of the terms of a contract voluntarily entered into by the parties, wherein the provisions of their agreement are clear and unambiguous. The contract rights and obligations here involved are those of sophisticated corporate parties dealing at arm's length. The Fourth is the largest financial institution in the State of Kansas, and had undertaken a fiduciary obligation, for compensation, that fell directly within the regular scope of its business activity and expertise.

It is not the function of the courts to make contracts but to enforce them. *Springer v. Litsey,* 185 Kan. 531, 535, 345 P.2d 669 (1959). The duty of courts is to sustain the legality of contracts when fairly entered into, and if reasonably possible to do so, rather than seek loopholes and technical legal grounds for defeating their intended purpose. *Eastern Distributing Co., Inc. v. Flynn,* 222 Kan. 666, 567 P.2d 1371 (1977); *Cox v. Cason,* 211 Kan. 789, 508 P.2d 499 (1973).

The basic legal principles here applicable are well expressed in 17 Am. Jur. 2d, *Contracts,* § 242 pp. 627-629 (1964):

"It is a fundamental principle that a court may not make a new contract for the parties or rewrite their contract under the guise of construction. In other words, the interpretation or construction of a contract does not include its modification or the creation of a new or different one. It must be construed and enforced according to the terms employed, and a court has no right to interpret the agreement as meaning something different from what the parties intended as expressed by the language they saw fit to employ. A court is not at liberty to revise, modify, or distort an agreement while professing to construe it, and has no right to make a different contract from that actually entered into by the parties. *Courts cannot make for the parties better or more equitable agreements than they themselves have been satisfied to make, or rewrite contracts because they operate harshly or inequitably as to one of the parties, or alter them for the benefit of one party and to the detriment of the other, or, by construction, relieve one of the parties from terms which he voluntarily consented to, or impose on him those which he did not.*" (Emphasis supplied)

The same basic legal principles are applicable to contracts for the sale of corporate stocks:

". . . Where the terms of a contract providing for the sale of stock are plain, unambiguous and lead to no absurd result, they must control; and they are not affected by previous negotiations nor subsequent conduct of the parties." 12A Fletcher Cyclopedia of the Law of Private Corporations § 5566 (1972).

In tendering the 6,062 shares of Marcor stock to Mobil, the Fourth agreed and guaranteed to deposit the actual certificates at a future time within the terms of the offer. The offer clearly and unambiguously specified the terms under which Mobil would purchase the shares tendered under this alternative method. The pertinent language provides:

". . . Payment for Shares so tendered and purchased will be made only against the deposit with the Depositary of the certificates and any other documents required by the Letter of Transmittal *no later than eight business days after public announcement by Mobil that a specified number of Shares will be purchased under this Offer* if all the terms and conditions of this Offer are satisfied." (Emphasis supplied)

The trial court appears to have confused the "announcement" provision of the contract with the "notice" provisions or requirements of due process cases arising under the federal and state constitutions. In fact, the "reasonably calculated" language used in the court's conclusions comes from a leading due process case. See *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 94 L.Ed. 865, 70 S.Ct. 652 (1950).

The contract between the parties did not obligate Mobil to give any "notice." The language of the contract clearly and unambiguously provided only that Mobil would make payment for shares deposited "no later than eight business days *after public announcement.*" Mobil was only required to proclaim or announce its intention to purchase shares. Mobil was not "obligated" to notify any institutions to send in the certificates.

The trial court ignored one of the cardinal principles of contract law that parties are free to contract for any type announcement or notice they desire. When the parties have specified the type of announcement or notice to be given, that provision is to be enforced as written, whether it results in actual notice or not. 58 Am. Jur. 2d, *Notice,* § 24 (1971).

Mobil, as the offeror, had the exclusive right to prescribe the terms of the offer. The shareholders of Marcor were free to accept

or reject the terms as offered. "As the offeror is at liberty to make no offer at all he is also at liberty to dictate whatever terms he sees fit if he chooses to make an offer. . . ." 1 Williston on Contracts § 53, p. 169 (3d ed., 1957).

"It is fundamental that a communicated offer creates a power to accept the offer that is made, and only that offer. Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer, but it is not an acceptance and constitutes no contract. Unless the original offeror subsequently expresses unconditional assent to the counter-offer there will never be a contract." *Steele v. Harrison,* 220 Kan. 422, 428, 552 P.2d 957 (1976).

The Fourth, as a knowledgeable and experienced banking institution, voluntarily agreed to the terms of the offer and cannot now be allowed to rewrite the contract nor may the court do so. The law presumes the Fourth understood the contract to mean what the terms import and the trial court erred in imposing a much higher standard of announcement than was contemplated by the contract of the parties.

Similar arguments and circumstances as in the case at bar, and growing out of the same tender offer, were recently decided in an action in the United States District Court for the Southern District of Indiana. (*The Indiana National Bank, Merchants National Bank & Trust Company of Indianapolis v. Mobil Oil Corporation,* No. IP 75-195-C [S.D. Ind. Oct. 13, 1977], aff'd, No. 77-2253 [7th Cir. June 19, 1978].) In that case INB and Merchants found themselves in the identical position of the Fourth in this case. INB and Merchants, while conceding that the press release satisfied Mobil's obligation under the tender offer, argued they were entitled to "notice" as distinguished from a "public announcement." The trial court in its opinion stated:

"Plaintiffs, in effect, have requested the Court to compensate them for their losses for the sole reason that notice may have been a better method than a public announcement. Plaintiffs urge that the number of failures in delivery guarantees support their position. The Court, however, cannot rewrite the tender offer through the guise of construing the offer. Mobil, aware that its offer price would probably evoke a substantial oversubscription and under pressure from the N.Y.S.E. and S.E.C. to promptly return unpurchased securities, elected to employ the public announcement mechanism to trigger deliveries. In this regard, Mobil, who was confronted with the unprecedented task of handling the 39,000 separate tenders, shifted some of the burden to eligible institutions in exchange for a commission fee. Whether or not individual notice or some other method would provide a better trigger is not the issue. The issue is whether a public announcement was an acceptable practice. Under the circumstances, this Court must

conclude that the use of a public announcement to trigger delayed deliveries is and was an acceptable practice.

"It is therefore the Court's conclusion that the plaintiffs, INB and Merchants, are not entitled to recover upon any of the theories presented to the Court. The Court has found no substance in the security law claims and has found that Mobil complied with the spirit and letter of its offer. Plaintiffs had a contractual right to a public announcement, not to individual notice. Mobil issued the press release which constituted the public announcement. For various reasons, which are more particularly known by employees of INB and Merchants, the plaintiffs simply failed to read and comprehend the announcement. Therefore, they must suffer the loss. Having so found, the Court finds it unnecessary to rule upon or discuss the defenses raised by Mobil."

The Fourth contends the press release issued by Mobil was not a "public announcement" as contemplated by the offer and letter of transmittal. The Fourth argues that some more specific form of notice should have been given, such as a "tombstone" advertisement. Tombstone advertisements are regularly used in the securities industry and are placed in financial publications such as The Wall Street Journal and, where appropriate, in local newspapers and national publications such as Time Magazine. In view of the fact that the responsible officer of the Fourth conceded he did not read The Wall Street Journal on a regular basis and had not seen the Mobil press release it is difficult to see how the placing of an advertisement in the same Journal would have provided any better form of announcement to the Fourth. In any event, the parties did not contract for a "tombstone advertisement" or for "notice" but only for a "public announcement."

It is difficult to imagine any other form of public announcement, short of a massive advertising campaign, that would have received a greater dissemination and publication in the various news and trade media.

We agree with the Indiana court that the press release issued by Mobil constituted a "public announcement" and was a sufficient compliance with its obligations under the contract. The Fourth, having failed to comply with the terms of the agreement with Mobil, was simply too late when it finally tendered the stock to Continental.

Having determined that Mobil issued the "public announcement" agreed to by the parties and that the Fourth failed to comply with the terms of the agreement, it is unnecessary to consider the other points raised by Mobil.

The judgment of the trial court is reversed with directions to enter judgment for the defendant.