IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,582

DELAWARE TOWNSHIP and HIGH PRAIRIE TOWNSHIP,
*Appellees*,

v.

CITY OF LANSING, KANSAS,
*Appellant*,

LEAVENWORTH COUNTY, KANSAS, and
LEAVENWORTH COUNTY BOARD OF COMMISSIONERS,
*Appellees*.

SYLLABUS BY THE COURT

When an interlocal agreement governing the operation and management of a fire district is terminated by one of the parties under the terms of the agreement, and the district's assets are allocated under those terms, the fire district itself is not altered or dissolved as a legal entity. Provisions in such interlocal agreements permitting termination and asset allocation after sufficient notice are not void for violating public policy.

Review of the judgment of the Court of Appeals in an unpublished opinion filed March 5, 2021. Appeal from Leavenworth District Court; DAVID J. KING, judge. Opinion filed July 8, 2022. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed.

*Adam M. Hall*, of Thompson-Hall, P.A., of Lawrence, argued the cause, and *Todd N. Thompson*, of the same firm, was with him on the briefs for appellant.

*Timothy P. Orrick*, of Orrick & Erskine, L.L.P., of Overland Park, argued the cause, and *Chadler E. Colgan*, of The Colgan Law Firm, of Kansas City, and *David C. VanParys*, Leavenworth County Counselor, were with him on the briefs for appellees.

*Johnathan Goodyear*, staff attorney, and *Amanda L. Stanley*, general counsel, of League of Kansas Municipalities, were on the briefs for amicus curiae League of Kansas Municipalities.

The opinion of the court was delivered by

STEGALL, J.:  This is a dispute between municipalities in Leavenworth County over the future and assets of a fire district. The City of Lansing wants to withdraw from an interlocal agreement governing the fire district. Other parties to the agreement object. After Lansing invoked the termination and asset division provisions of the agreement, this suit was filed. The lower courts ruled against Lansing, holding that the termination and asset division provisions of the agreement were unenforceable because of a "conflicting" statute governing the creation and termination of fire districts. Lower courts also found public policy reasons to disallow the sought-after termination. Today we reverse those decisions and hold that the agreement is enforceable by its clear terms.

The parties have stipulated to the facts as summarized below. As such, our review is plenary. *Rucker v. DeLay*, 295 Kan. 826, 830, 289 P.3d 1166 (2012); *Weber v. Board of Marshall County Comm'rs*, 289 Kan. 1166, 1175-76, 221 P.3d 1094 (2009).

In 2003, the Leavenworth Board of County Commissioners created Fire District No. 1 under K.S.A. 19-3601 et seq., the Fire Protection Act. The Fire District included the City of Lansing, Delaware Township, and High Prairie Township (all parties to this case). At the same time the County Commission created the Fire District, the municipalities all entered into an Interlocal Agreement under K.S.A. 12-2901 et seq.,

2

the Interlocal Cooperation Act. This Agreement set forth the terms and conditions governing the joint operation and management of the Fire District.

The Attorney General approved the Agreement as complying with Kansas' Interlocal Cooperation Act, which included approving several required provisions relevant to this lawsuit. Those required provisions detail the ownership of Fire District assets and—most importantly—how the Agreement may be terminated and the assets divided. The original term of the Agreement was five years, to be automatically renewed in subsequent four-year terms, unless a party properly terminated the Agreement.

Paragraph 8(a) of the Agreement states, "[o]n or after January 1, 2004, any equipment, vehicle, building, personalty or real property acquired by the Fire District, by purchase, contribution or otherwise, except as otherwise provided below, shall be owned solely by the Fire District."

Paragraph 8(b) of the Agreement outlines a few limited, time-based exceptions for "special property." Special property includes the existing township fire stations, which were retained by the respective townships. The Fire District would later purchase the fire stations for $1 after 10 years per the terms of the Agreement. During the initial 10 years, the townships agreed to lease those same buildings, as well as equipment and vehicles, to the Fire District for $1 a year.

Under Paragraph 10(b), termination of the Agreement could be initiated by "any party" but required 18 months advance notice and triggered a specific distribution of assets and liabilities. The termination provisions were divided into two sections. First, "Paragraph 8 of this agreement shall apply and the property referenced shall be disposed of in accordance with the terms of that section." As explained above, Paragraph 8 deals

with the title to property purchased by the Fire District as well as property each party brought into the Agreement, such as the townships' fire stations.

For all other assets not covered by Paragraph 8, Paragraph 10(c)(2) provides those assets "shall be apportioned between the parties based upon the assessed valuation of each party as compared to the assessed valuation of the Fire District as a whole." To determine the valuation, the parties must "utilize accepted accounting and depreciation practices." In the event a valuation dispute arose, the parties agreed to submit to binding arbitration.

Additionally, if the Fire District had any liabilities at the time of termination, Paragraph 10(d) of the Agreement provided that the parties "shall jointly be responsible for the discharge of that liability." A party's contribution would be based "upon a comparison of the assessed valuation of each party as each party compared to the assessed valuation of the Fire District as a whole."

All parties operated under the terms of the Agreement for 15 years. Then in 2018, Lansing sent appropriate notice of its intent to terminate the Agreement and begin providing its own fire protection services. As part of Lansing's right of termination, Lansing sought division and disposition of the Fire District's property.

Delaware and High Prairie petitioned for declaratory judgment to stop the dissolution or alteration of the Fire District and the disposition of the Fire District property. The townships argued that under K.S.A. 19-3604, a fire district may only be disorganized after the county commission which created the fire district adopts a resolution to disorganize it. And that this may be done only after a proper petition by county residents. The townships argued the sections in the Agreement that Lansing relied on to terminate the Agreement were illegal and unenforceable.

4

Lansing responded with a counterclaim seeking a declaratory judgment that the Agreement was enforceable in its entirety. It argued that its notice was sufficient to terminate the Agreement and trigger the division of assets. Crucially, Lansing maintains that ending the Interlocal Agreement does not dissolve the Fire District itself.

After the lower courts disagreed with Lansing, the city petitioned this court for review, and we granted its petition. The district court ruled in favor of Delaware and High Prairie. Lansing appealed. The Court of Appeals affirmed the judgment of the district court holding that Lansing could not unilaterally alter or disorganize the Fire District and could not force a disposition of property as a matter of public policy. *Delaware Township v. City of Lansing, Kansas*, No. 122,582, 2021 WL 833520 (Kan. App. 2021) (unpublished opinion).

DISCUSSION

In this case, the legal arguments arise out of two distinct statutory frameworks. The first, K.S.A. 19-3601 et seq., controls the formation, governance, and termination of fire districts in Kansas. The second, K.S.A. 12-2901 et seq., controls the creation, governance, basic terms, and termination of interlocal agreements in Kansas.

Delaware and High Prairie contend that the "more specific" fire district termination provisions of K.S.A. 19-3604 should override the Agreement's termination provisions authorized by K.S.A. 2021 Supp. 12-2904. Allowing unilateral termination of the Agreement, Delaware and High Prairie contend, is also against public policy because of the public safety importance of fire suppression.

Lansing argues the Agreement may be terminated by its terms—which conform to the requirements of K.S.A. 2021 Supp. 12-2904. From the City's perspective, the two statutory frameworks govern different things entirely, and the termination of an interlocal agreement has no legal impact on the continuing existence of a fire district as a legal entity under K.S.A. 19-3601 et seq. Lansing also insists there is no basis to the claim that this arrangement would create a threat to public safety.

We note as well that an argument concerning constitutional home rule was also bandied about by the parties and the district court in this case. Because we rule exclusively on statutory grounds, we need not reach the home rule questions as they are not relevant to the parties' dispute.

When we interpret statutes and private agreements, such as the parties' Interlocal Agreement, our review is unlimited. *Stewart Title of the Midwest v. Reece & Nichols Realtors*, 294 Kan. 553, 557, 276 P.3d 188 (2012). Likewise, when reviewing the interpretation and legal effect of written instruments, we exercise unlimited review, and are not bound by the lower courts' interpretations of those instruments. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016).

To understand the relationship between the Agreement, the Fire District, and the statutes governing each, we must make every effort to give effect to the plain language of both the Agreement and the statutes. *State v. Smith*, 309 Kan. 929, 932-33, 441 P.3d 472 (2019).

The Agreement states that the Fire District was formed "pursuant to the provisions of K.S.A. 19-3601 et seq." Under K.S.A. 19-3601 et seq.: "The board of county commissioners of any county of the state is hereby authorized and empowered to organize one or more fire districts." The Board's power to organize fire districts is distinct

6

from any formation of an interlocal agreement between municipalities. To illustrate this, K.S.A. 19-3612a(b) incorporates the Interlocal Cooperation Act by reference by explaining how a designated board of county commissioners along with the governing bodies of cities and townships located within the district may enter into an interlocal agreement and delegate authority to appoint a fire district board of trustees.

At no point in K.S.A. 19-3601 et seq. or K.S.A. 12-2901 et seq. is there a reference to a fire district being *created* through the formation of an interlocal agreement—and for good reason. The purpose of an interlocal agreement is to

> "permit local governmental units to make the most efficient use of their powers by enabling them to cooperate with other localities, persons, associations and corporations on a basis of mutual advantage and thereby to provide services and facilities in a manner and pursuant to forms of governmental organization that will accord best with geographic, economic, population and other factors influencing the needs and development of local communities." K.S.A. 12-2901.

But the power to create or dissolve a fire district is not within the scope of an interlocal agreement. In fact, the procedure to disorganize or alter the territory of a fire district is rigid and specifically laid out in K.S.A. 19-3604:

> "(a) Any fire district may be disorganized by the board of county commissioners at any time after four years from the date of the publication of the final resolution for the first organization of such district upon a petition to the board and the making of an order *in like manner as in the case of organizing any fire district under K.S.A. 19-3603, and amendments thereto.*
>
> "(b) Subject to the provisions of K.S.A. 19-270, the territory of any organized fire district *may be subsequently altered by the inclusion of new lands or by the exclusion of lands therein upon a petition to the board of county commissioners signed by the owners of at least 10% of the area of the lands sought to be included or excluded, which*

*petition shall conform, as near as may be possible, to the petition required for the organization of a fire district.* If the board of county commissioners finds the petition is sufficient, the board may adopt and publish a resolution attaching or detaching the lands described in the petition to or from the fire district. The resolution shall be published once each week for two consecutive weeks in a newspaper of general circulation in the area where the lands are located. Such publication shall include a map showing the territory of the district and the lands proposed to be attached to or detached therefrom. If within 30 days after the last publication of the resolution and map, a petition protesting the inclusion or detachment of such lands, signed by the owners, whether residents of the county or not, of more than 19% of the area of the lands sought to be included in or excluded from the fire district is filed with the county clerk, the resolution shall have no force or effect. If such a protest petition shall not be filed within such time, the resolution shall become final, and the lands shall thereupon be deemed attached to or detached from the fire district. In any case where lands are included in or excluded from a fire district as provided herein, the board shall declare the new boundary of the district by the adoption and publication of a resolution in like manner as the boundaries were declared at the time of the original organization thereof." (Emphases added.)

K.S.A. 2021 Supp. 12-2904 generally defines the scope and use of interlocal agreements, authorizes the use of interlocal agreements to handle public functions (including fire services), sets forth the basic legal requirements of agreements, and requires attorney general approval of certain types of agreements.

K.S.A. 2021 Supp. 12-2904(d)(5) requires that interlocal agreements contain a termination provision that also details the disposition of property. The specific terms of this contract provision are left to the parties to negotiate.

"(d) Any such agreement shall specify the following:

(1) Its duration.
(2) The precise organization, composition and nature of any separate legal or administrative entity created thereby together with the powers delegated thereto.

8

(3) Its purpose or purposes.

(4) The manner of financing the joint or cooperative undertaking and of establishing and maintaining a budget therefor.

(5) *The permissible method or methods to be employed in accomplishing the partial or complete termination of the agreement and for disposing of property upon such partial or complete termination.*

(6) Any other necessary and proper matters." (Emphasis added.)

Lastly, K.S.A. 19-3612a outlines the process for the board of county commissioners to delegate all or some governing powers to a board of trustees. And K.S.A. 19-3612a(b) governs the process when the fire district is operating under an interlocal agreement:

"(b) *Pursuant to an interlocal agreement* entered into by the board of county commissioners and the governing bodies of cities and townships located within the fire district, the board of county commissioners may delegate its authority to appoint the members of the fire district board of trustees to a joint board appointed by the governing bodies of cities and townships located within the fire district. The fire district board of trustees appointed by such joint board shall be vested with all of those powers vested in the board of county commissioners under K.S.A. 19-3601 through 19-3606, and amendments thereto.

"*Any interlocal agreement entered into pursuant to this subsection shall be subject to the provisions of K.S.A. 12-2901 et seq., and amendments thereto*." (Emphases added.)

Both sets of statutes concern fire districts—one authorizes and governs the power to create, alter, and dissolve districts, while the other authorizes and governs how municipalities within the district can cooperate to operate and manage the fire suppression services within the fire district. These two schemes and purposes do not conflict. One is not more "specific" than the other. Instead,

9

they are *in pari materia*, and work together harmoniously. See *Miller v. Board of Wabaunsee County Comm'rs*, 305 Kan. 1056, 1066, 390 P.3d 504 (2017).

The takeaway from this analysis is simple—the Interlocal Agreement can operate according to its plain terms (and the parties do not dispute the plain meaning of the Agreement) without impacting the ongoing existence and viability of the Fire District. That district will simply need to arrive at a new arrangement for the provision of fire suppression services within its boundaries. This is the outcome the Court of Appeals deemed "nonsensical." *Delaware Township*, 2021 WL 833520, at *7 ("Lansing's stated intent—seems nonsensical because the Fire District itself continues to exist. The Fire District continues to need and use the property that would be disposed of. If Lansing instead sought to disorganize, or withdraw from, the Fire District, the disposition of Fire District property seems more understandable.").

However difficult it may be to separate the identity of the Fire District as a legal entity from the obligations of the parties under the Agreement, the plain language of the Agreement clearly makes this distinction itself. The Agreement acknowledges there is a functional distinction between terminating the "Fire District" and the "Agreement." Paragraph 10(a) of the Agreement incorporates the procedures of K.S.A. 19-3604 in instances where the Board of Leavenworth County Commissioners wishes to "*disorganize the Fire District.*" (Emphasis added.) Alternatively, Paragraph 10(b) provides a separate procedure (included as required by K.S.A. 2021 Supp. 12-2904[d][5]) in order to terminate "*this agreement.*" (Emphasis added.) Paragraph 10(c) also specifically deals with the distribution of property upon the termination of "*this agreement.*" (Emphasis added.) This language, consistent with the language of the governing statutes, makes clear there is a material distinction between the "Fire District" and the "Agreement."

10

"It is not the function of courts to make contracts, but to enforce them as made." *Tri-State Hotel Co., Inc. v. Sphinx Investment Co., Inc.*, 212 Kan. 234, 246, 510 P.2d 1223 (1973). """It is the duty of courts to sustain the legality of contracts in whole or in part when fairly entered into, if reasonably possible to do so, rather than to seek loopholes and technical legal grounds for defeating their intended purpose.""" *Wasinger v. Roman Catholic Diocese of Salina*, 55 Kan. App. 2d 77, 80, 407 P.3d 665 (2017). The power of any party, including Lansing, to terminate the Agreement was clearly bargained for, and Delaware and High Prairie concede as much.

Thus, the Agreement is enforceable on its own terms without placing the Fire District itself in any jeopardy of being unlawfully dissolved. We understand that, as a practical matter, without the Agreement the Fire District may be just a legal "shell"—but that is in fact what a Fire District is. A shell to lawfully acquire, hold, and manage all of the assets and personnel required to provide fire suppression services within its geographical boundaries.

Delaware and High Prairie townships continue to insist that even if the end of the Agreement does not technically dissolve the Fire District, it is a "de facto" disorganization because replacing the "guts" of the district will be difficult or impossible, resulting in a Fire District that does not provide any fire suppression services within its boundaries. The townships insist this outcome violates public policy and that any contractual provision leading to such an outcome must be void as against that public policy. We disagree.

Terminating the Agreement is certainly the beginning of an attempt by Lansing to step away from the Fire District; however, this is no reason to invalidate the termination provisions of the Agreement. If this were the case, the provision allowing for the *actual* dissolution of the Fire District would themselves violate this vague and ill-defined public

11

policy in favor of never altering how fire suppression services are delivered to a particular population. So, if a municipality chooses to stop participating in the management and operation of a Fire District—by invoking the very terms by which it agreed to participate in the first place—we ask rhetorically "so what?" The alternative of forcing the parties to remain locked in an agreement that no party bargained for is, to us, both nonsensical and not in furtherance of any public safety policy.

This is not to say that fire suppression is not a serious matter of public safety and concern. Contracts may indeed be void as against public policy if they are ""injurious to the interests of the public . . . or tend[] to interfere with the public welfare or safety."" *In re Marriage of Traster*, 301 Kan. 88, 105, 339 P.3d 778 (2014). But we cannot agree with the way the townships and the Court of Appeals connected the public safety dots by disincentivizing municipalities from cooperating to provide this key service in the first place. Rather, ""the paramount public policy is that freedom to contract is not to be interfered with lightly."" *Wasinger*, 55 Kan. App. 2d at 80.

Indeed, Lansing makes several compelling arguments to address public safety concerns. First, Lansing has shown there is no reason to believe any citizen would be left without adequate fire protection. Upon termination of the Agreement, the distribution of assets under Paragraph 10 would be based on a fair appraisal of each parties' percentage makeup of the Fire District. In addition to the fair distribution of assets, the Agreement also provides for a relative allocation of liabilities across all parties. This arrangement would leave no party with disproportionate access to resources or stuck with disproportionate liabilities. In the event that the parties cannot agree on what is "fair," the Agreement requires arbitration by a third party.

There is no reason to believe that individual party ownership of Fire District assets is an inherent threat to public safety. When the parties initially entered into the Agreement, the parties retained title to their own assets—leasing them to the Fire District and eventually selling them to the Fire District per the terms of Paragraph 8.

And lastly, it should be noted that no party is prejudiced by unfair surprise by termination of the Agreement, as 18 months' notice is required. This term was surely bargained for to allow the parties to make these exact kinds of appropriate arrangements.

In conclusion, we hold that Lansing's notice of termination of the Agreement was effective, and the parties must allocate assets and liabilities per the terms of the Agreement.

Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed.